Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the alleged contraction of an occupational disease, the parties were subject to and bound by the provisions of the Workers Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Collins Aikman Company was a self-insured employer.
4. Plaintiffs average weekly wage was $1,025.96.
5. Plaintiffs last date of work was July 12, 1994.
In addition, the parties stipulated into evidence the following:
1. Packet of medical records and reports.
2. Packet of material safety data sheets, which represent substances used in the laboratory where plaintiff worked.
3. Job description of Senior Research Chemist.
4. Job description of Product Safety Chemist.
***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. Plaintiff, who is sixty-five years old and who has a Bachelor of Science degree in textile chemistry, began working for defendant in July 1977 as a research chemist. By that time, he had had eighteen years of experience with other textile companies performing technical and development work. His job with defendant involved studying dyes and chemicals so that the companys plants and suppliers would be using the best dyes and dyeing techniques for the fabrics made. The company manufactured textiles used in the automotive industry.
2. The research and development laboratory where plaintiff worked was located in the corporate headquarters building in Charlotte. The laboratory was divided between an office area and the actual laboratory area where the chemicals were mixed and applied. However, plaintiffs office was a cubicle, so it was open to the laboratory at the top. The company employed a laboratory technician who performed most of the actual lab testing under plaintiffs direction. There were occasions, however, when plaintiff had to perform some of the tests himself because he was training a new technician or because there was a greater volume of work than the technician could complete.
3. Some of the testing performed in the laboratory included "strike rate tests, which determined the temperature at which the dye would bind with the fabric, tests to see how a dye could best be stripped from fabric, and tests to measure the colorfastness of dyes with particular emphasis on how they would be used in the automotive industry. There were a large number of dyes and chemicals used in the laboratory for these tests. Some of the chemicals were known to be respiratory irritants in high enough quantities, but the laboratory was well ventilated and the chemicals were generally used in small amounts.
4. Plaintiffs job duties also included traveling to the companys manufacturing sites and to some of the companys suppliers to see how various dyeing processes were being carried out in the field. Consequently, plaintiff would be away from the Charlotte site between thirty and forty percent of the time. When he was working in Charlotte, plaintiff spent at least half of his time working in his office. While working in the lab area, plaintiff was usually supervising the lab technician and not performing the chemical tests himself.
5. Plaintiffs first reported respiratory problems were recorded in September 1979 by Dr. Kouri, his family doctor. Thereafter, plaintiff experienced episodes of coughing and chest pain, which were usually diagnosed as bronchitis and treated with antibiotics, with resolution of the symptoms. These episodes occurred every two to three years but began to develop more frequently in the 1990s. In February 1993 his symptoms were severe enough that Dr. Kouri thought that plaintiff might have a low-grade pneumonitis.
6. On June 12, 1994 plaintiff saw Dr. Kouri with a severe cough that had started several days previously. Dr. Kouris initial impression was that plaintiff probably had pneumonia. However, subsequent testing for other conditions revealed an extremely high titer for Legionella such that it could represent an acute infection. Plaintiff also demonstrated antibodies for micoplasma, which could also produce similar symptoms. Plaintiff was ill beyond having a simple cough and experienced persistent fatigue and shortness of breath on exertion until August. Consequently, Dr. Kouri referred plaintiff to Charlotte Pulmonary Associates where he saw Dr. Smart, a young pulmonologist who had just joined the practice. Plaintiff told Dr. Smart that his symptoms were associated with a history of exposure to multiple chemicals at work.
7. Dr. Smart ordered a CT Scan and other diagnostic tests in order to rule out other causes for plaintiffs symptoms, such as asthma and sinus problems. The tests did not reveal a specific problem, and plaintiffs examinations were essentially normal. Consequently, Dr. Smart concluded that plaintiff had hyperreactive airways disease and that, based upon his history, his symptoms were due to exposure to chemicals at work. Plaintiffs employer was notified of Dr. Smarts opinion.
8. Defendant then sent plaintiff to Dr. Harris, a pulmonary disease specialist who is on the Industrial Commissions Advisory Panel. Dr. Harris evaluated plaintiff on January 24, 1995, reviewed his medical records and also reviewed the material safety data sheets submitted by the employer. Plaintiffs physical examination was essentially normal, his x-rays were normal, and the pulmonary function studies performed in the doctors office were also normal. There was no history of acute symptoms upon exposures to any particular substances at work. Rather, plaintiff described having periodic bouts of bronchitis and his belief that his exposure to chemicals at work had made him more susceptible to infections. Dr. Harris found no evidence of obstructive or restrictive lung disease and concluded that there was not enough evidence to suggest that chemical exposures at work had precipitated the problems, although he could not exclude the possibility.
9. Dr. Smart then ordered a bronchoscopy that revealed erythema, or reddening, of the airways, a finding usually associated with inflammation. Plaintiff remained under Dr. Smarts care until he left that practice. Dr. Kremers then became plaintiffs treating pulmonologist and treated him with intermittent antibiotics, bronchodilators and anti-inflammatory medication. In Dr. Kremerss opinion, plaintiff was one of a small population of individuals who reacted to extremely small amounts of chemicals, amounts that would probably not be a problem for most people. When Dr. Kremers saw him, plaintiffs airways were hypersensitive and were reacting to chemical fumes, car exhaust, cleaning fluids, perfumes and other substances. However, his reaction was more of a personal idiosyncratic nature than it was due to chemicals in the workplace.
10. Plaintiff has claimed that he has developed hyperreactive airways disease as a result of his exposure to chemicals during his employment with defendant. For the following reasons, he has not proven that allegation. Contrary to what he told Dr. Smart, he did not have "fairly extensive exposure to hazardous chemicals; nor were his symptoms associated with chemical exposures at work until he was also reacting to any fumes, whether at work or at home. The lab where plaintiff worked was well ventilated. Plaintiff was not performing most of the tests himself and the activities conducted in the lab usually involved small amounts of the chemicals. Therefore, the evidence did not establish a hazardous exposure.
11. Even with an inaccurate history, Dr. Smart could not state that an employee in plaintiffs position would have been placed at an increased risk of developing hyperreactive airways disease as compared to the general public not so employed. The medical evidence established only that there was a possible risk and possible relationship associated with plaintiffs workplace exposures, but, with the present state of medical knowledge, the exposures could not be said to be a probable significant contributing factor in the development of his hyperreactive airways disease. Rather, if plaintiff did have some sort of a reaction to the chemicals at work, it was due to an unusual sensitivity on his part to small amounts of chemicals that would not be a problem for most people.
12. By the greater weight of the evidence, plaintiff was not proven to have been placed at an increased risk of developing hyperreactive airways disease by reason of his exposure to chemicals at work as compared to the general public not so employed. Nor was plaintiffs workplace exposure proven to have been a significant contributing factor in the development of his pulmonary condition.
13. Plaintiff has failed to prove that he developed an occupational disease that was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed.
***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff has not proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. 97-53(13) ; Click v.Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980) ;Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
2. Plaintiffs condition was caused by his personal, unusual sensitivity to small amounts of certain chemicals. Sebastian v. Hair Styling,40 N.C. App. 30, 254 S.E.2d 921, disc. rev. denied, 297 N.C. 301,254 S.E.2d 921 (1979).
3. Plaintiff is not entitled to benefits under the Workers Compensation Act for his hyperreactive airways disease. N.C. Gen. Stat. 97-2 et seq.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
ORDER
1. Under the law, this claim must be and hereby is DENIED.
2. Each side shall pay its own costs.
This the ___ day of July 2000.
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/_______________ RENÉE C. RIGGSBEE COMMISSIONER
DISSENTING:
S/_____________ THOMAS J. BOLCH COMMISSIONER